Filed 12/13/21  P. v. Superior Court (Fernandez) CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>_____<br><br>JOSE A. FERNANDEZ,<br><br>Real Party in Interest. | B305058<br><br>(Los Angeles County<br> Super. Ct. No. YA096660) |

ORIGINAL PROCEEDINGS in mandate.  Superior Court of Los Angeles County.  Ronald S. Coen, Judge.  Petition granted; remanded with directions.

Jackie Lacey and George Gascon, District Attorneys, John Niedermann, Matthew Brown, Felicia Shu and Kenneth Von Helmolt, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Andrues Podberesky, Vicki Podberesky and Dillon Malar for Real Party in Interest.

\* \* \* \* \* \* \* \* \* \*

The superior court partially granted the motion to dismiss of defendant and real party in interest Jose A. Fernandez, dismissing seven of 12 felony counts of official misconduct on the ground they were barred by the four-year statute of limitations codified at Penal Code section 801.5.

The People timely filed a petition for writ of mandate arguing the superior court erred in finding the counts were time-barred. Pretrial review by writ was appropriate because the court's order did not resolve all counts. (*People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123, 1125 (*Lujan*).)

We grant the petition and issue a writ of mandate directing respondent superior court to vacate its order and enter a new order denying Fernandez's motion to dismiss.

**FACTUAL AND PROCEDURAL BACKGROUND**

Centinela Valley Union High School District (the district) is a public school district in Los Angeles County. After serving as the interim district superintendent for nearly two years, real party in interest Jose Fernandez was hired in 2009 by the district's five-member board of education (the board) for a three-year term. Shortly before his term expired in June 2012, the board approved a four-year contract extension.

In February 2014, the Daily Breeze published an article raising numerous questions about Fernandez's generous compensation, echoing criticisms raised in an earlier, December 2010 article in the same newspaper. (Kuznia, *Centinela Valley schools chief amassed $663,000 in compensation in 2013*, Daily

Breeze (Feb. 8, 2014); Kuznia, *'Magnificent' deal outrages Centinela Valley teachers*, Daily Breeze (Dec. 19, 2010).) The 2014 article prompted an internal investigation by the district and an audit by the Los Angeles County Office of Education. Fernandez was placed on administrative leave, and the matter was turned over to the Los Angeles District Attorney's Office.

## 1. The Charges

The District Attorney's Office filed a felony complaint on August 29, 2017, charging Fernandez with 12 counts of official misconduct between 2009 and 2014, including embezzlement of public funds (Pen. Code, § 504, § 514; count 1), conflicts of interest (Gov. Code, § 1090; counts 2, 3, 4, 6, 7 & 9), appropriation of public monies (Pen. Code, § 424, subd. (a); counts 5, 8 & 10) and grand theft (Pen. Code, § 487, subd. (a); counts 11 & 12).

Citing Penal Code section 803, subdivision (c), the People alleged the "violations were not discovered and could not reasonably have been discovered until after February 12, 2014." Several paragraphs detailed the reasons for the delayed discovery. We summarize the discovery allegations.

After the February 2014 Daily Breeze article, the board retained attorney Dennis Hernandez to review Fernandez's employment contract. On March 11, 2014, Mr. Hernandez made a presentation to the board that outlined the substantial financial benefits paid to Fernandez beyond what had been disclosed to the board. Fernandez had misrepresented to board members that the information previously reported by the media relating to his compensation package was incorrect and exaggerated. "It was not until District Attorney investigators obtained voluminous documents and conducted interviews with

3

numerous witnesses that facts giving notice of the criminality of Fernandez's actions were discovered by law enforcement and by a governmental official with supervisory authority over Fernandez."

Fernandez often concealed information from the board that "prevented the Board from discovering Fernandez's crimes against the district. For example, by overwhelming the Board with the consideration of revisions to approximately 3,000 board bylaws, board policies, and administrative regulations in December of 2010, defendant Fernandez succeeded in burying lucrative financial provisions for himself in the alleged revisions. Fernandez also lied to the Board when he told them the revisions were all standard updates based on model policies developed by the California School Board Association when in fact, two new policies contained benefit provisions that were unique [provisions Fernandez drafted]." "Fernandez also concealed from the Board a supplemental retirement benefit he conferred upon himself [in two separate plans,] misrepresented the cost of the plan, and he unilaterally manipulated the definition of the defined benefit conferred without allowing actuarial costs for his changes to be computed."

"Defendant Fernandez failed to invite legal counsel to advise the Board at the February 28, 2012, Board meeting in which he proposed an addendum to his employment contract[,] [failed to explain] the effect of the amendment, and concealed [information] material to the Board making an informed decision."

"In December of 2012, Fernandez failed to present to the board for ratification a mortgage agreement, promissory note, and deed of trust for a home loan in the amount of $910,000 that

4

was paid entirely by [the district].  A $910,000 check to the Santa Monica escrow company was the only aspect of this transaction submitted to the Board and it was done so surreptitiously."

"Between 2011 and 2013, defendant Fernandez failed to seek ratification for excess salary paid by [the district] to himself. Fernandez also failed to inform the Board that payments made to him by [the district] for additional retirement service credit in 2013 were in fact purchased in 2009 well before ratification of his employment contract and using money from a business previously owned by Fernandez that closed due to bankruptcy. Fernandez concealed the extent of the 'reimbursement' payments made to him by distributing the reimbursements over four payments between January and November 2013 and without notice to or consent from the Board."

## 2.    The Preliminary Hearing

The preliminary hearing began in January 2019 before Judge Stephen Marcus.  Numerous witnesses testified over the course of 10 days.

### a.    The Board

The district is governed by a five-member board.  Board members are elected, serve in a part-time capacity, and receive a few hundred dollars a month in compensation for their time.  The primary duty of the board is setting policy and overseeing the work of the superintendent.  The superintendent is considered the CEO of the district with responsibility for maintaining the fiscal health and welfare of the district and managing the day-to-day operations.  Fernandez's employment contract with the district specified he was both the CEO of the district and secretary of the board.

5

The five members of the board during the relevant time period were Gloria Ramos, Sandra Suarez, Rocio Pizano, Maritza Molina and Hugo Rojas.

Gloria Ramos was elected to the board in 2007 and remained a member of the board at the time of her testimony. She worked for the district for several decades, starting out as a cafeteria worker. She held various positions including attendance clerk and librarian before eventually running for the board.

Sandra Suarez was a member of the board from 2007 to 2011. Ms. Suarez has an associate arts degree, but no financial education or training.

Rocio Pizano was a board member from 2005 to 2018. She has a degree in accounting and worked fulltime for American Honda Motor Company while serving on the board.

Maritza Molina was elected to the board in November 2009, a few months after graduating from college and just before the board vote on Fernandez's employment contract. She served until 2015 when she resigned.

Hugo Rojas was elected in November 2009 and was still serving on the board at the time of his testimony. He served as board president in 2010, 2015 and 2018. (Members rotated serving in that capacity.) Mr. Rojas had prior experience serving on the board of the Hawthorne School District. Like the other members, he has always had a separate full time position while serving on the board.

The board held general public meetings twice a month. If situations arose that warranted an additional meeting, a special meeting was noticed in accordance with the Education Code and board bylaws. Several days before each meeting, board members

received a packet of information with the agenda and materials summarizing the issues that would be discussed and voted on at the meeting. Descriptions and analyses were generally short and summary in nature. If members had any questions, they were supposed to direct those questions to Fernandez.

Fernandez routinely held what were called "board briefings" before general meetings. They were casual lunch meetings that lasted no more than an hour, and attendance was voluntary. The board briefings gave members an opportunity to ask questions of Fernandez before voting on agenda items. Mr. Rojas relied on those briefings in making decisions on how to vote.

Ronald Hacker, the assistant superintendent of business services, testified the district operated on the theory that the board has one employee, the superintendent. All other administrative employees and assistant superintendents reported to the superintendent and did not have direct relationships with the board members. Bob Cox, assistant superintendent of human resources, also testified it was not his normal practice to speak directly to board members.

     **b.    Fernandez negotiates a lucrative employment contract in 2009 by telling the board it was a standard form used by the Association of California School Administrators.**

In December 2007, Fernandez was installed as interim superintendent. Ms. Ramos, who was board president at the time, testified that while serving as interim superintendent, Fernandez asked for a longer-term contract with additional benefits. Ms. Ramos thought some of the benefits Fernandez wanted were not appropriate. In December 2009, a special

7

meeting was scheduled to discuss and vote on Fernandez's employment contract.

Ms. Ramos was on maternity leave when the special meeting was held. She received the agenda materials at home and participated in the meeting by telephone. The board discussed Fernandez's contract and agreed to increase Fernandez's compensation but was not inclined to include several of the benefits Fernandez had requested. The board voted unanimously to approve the contract.

Several days later, the contract was brought to Ms. Ramos's home for signature, as she was still on maternity leave. The four other board members had already signed off on it. Ms. Ramos testified that, as she started reading through the contract before signing, she realized it contained different terms than the contract the board had approved. She compared it to the copy she had received. The contract sent for her signature was backdated to an effective date of July 2009 and included several provisions the board had not approved, including a 9 percent longevity bonus, 30 days of paid vacation instead of 20 days, a home loan option, and a $1 million life insurance policy. Ms. Ramos refused to sign the contract.

Ms. Ramos called Fernandez to confront him about the changes. He told Ms. Ramos he had worked hard for the district getting it out of bankruptcy, and he had not sought anything unusual, but had relied on form contracts from the Association of California School Administrators. He also told her he would not exercise the home loan option. Ms. Ramos testified Fernandez basically "talked [her] down." Nevertheless, she told the other board members about her discussion with Fernandez and asked

for a special meeting to further discuss the contract. But a majority did not agree to hold another special meeting.

Ms. Suarez testified the board discussed the contract before voting unanimously to approve it. The discussions were held in closed session with Fernandez present. It was not unusual for the board to discuss personnel matters in closed session because of confidentiality concerns. Ms. Suarez did not recall any specific topics discussed but did recall Fernandez saying he obtained sample contracts from the Association of California School Administrators.

Ms. Molina testified the December 2009 meeting was her first meeting after being sworn in as a member of the board. She did not have much time to review the contract before the vote, but she recalled a brief discussion in closed session with Fernandez, with some district lawyers present. One of the attorneys said the contract was standard for the industry, and Fernandez agreed with that characterization. Ms. Molina understood the lawyers represented the interests of the district and were there to provide information and guidance to the board. She voted to approve the contract, relying on the lawyers' statements.

Ms. Pizano and Mr. Rojas could not recall any specifics about the discussion of Fernandez's employment contract. Ms. Pizano believed there was a brief discussion of the life insurance policy and the home loan provision. Fernandez told the board the provisions were standard and based on a form contract used by the Association of California School Administrators. Like Ms. Molina, Mr. Rojas was a new member of the board and had been sworn in shortly before the 2009 special meeting. Mr. Rojas testified the board members did the

9

best they could according to their abilities given the limited resources and the time they had.

**c.    All communications with district lawyers are funneled through Fernandez.**

The district employed several outside law firms to provide legal advice, including Dannis Woliver Kelley (DWK). Three of the DWK attorneys who performed work for the district testified, pursuant to immunity agreements, at the preliminary hearing, Samuel Santana, Sue Ann Evans and Candace Bandoian. Two other attorneys who were not affiliated with DWK also performed work for the district and testified at the hearing, Dennis Hernandez and Jack Ballas.

All the attorneys testified the district was their client, not Fernandez personally. However, because Fernandez was the head representative of the district, he was their usual contact person. Sometimes they would speak with district management personnel like Mr. Hacker, the assistant superintendent of business services. But they did not ordinarily communicate directly with board members.

The board members confirmed this was the normal practice. Ms. Suarez testified any questions for, or information from, the district's lawyers came through Fernandez. Ms. Molina never personally sought advice from district counsel because Fernandez repeatedly said that legal questions should be directed to him. Mr. Rojas testified that any legal issues were supposed to be shared with Fernandez who would then determine whether to seek advice from district counsel. Ms. Ramos testified Fernandez made it very clear to the board that any legal questions had to go through him.

Mr. Ballas, who had known Fernandez for years, testified he was hired by the district to review its legal bills and look for ways to reduce expenditures on legal fees. He also worked on new protocols restricting who was authorized to contact district lawyers for advice and requiring logs about when any such contacts were made.

**d.      The 2010 Daily Breeze article reports teachers' union criticism of Fernandez's compensation.**

On December 19, 2010, an article was published in the Daily Breeze criticizing the compensation package in Fernandez's 2009 contract. The article did not implicate Fernandez in criminal misconduct. Rather, the article focused on criticism of the board from the teachers' union for having approved his contract. The article also acknowledged several achievements by Fernandez during the then-recession, including bringing the district back from near bankruptcy, preventing widespread teacher layoffs, raising student test scores and successfully getting two construction bonds passed.

Ms. Molina recalled seeing the article and that the head of the teachers' union spoke out against Fernandez's compensation package at a board meeting in early 2011. Ms. Molina testified that Fernandez and some of the district lawyers told the board his compensation package was standard for superintendents throughout the state.

**e.      Fernandez buries additional personal benefits in reams of board bylaws and policies.**

Sometime in late 2010, the board members were given three to four large binders containing the board's governing bylaws and policies. Fernandez said they had not been updated in decades and recommended they be revised and updated.

11

Ms. Ramos testified the board was told the proposed revisions were based on model policies and templates from the California School Board Association.

Much later, in 2014, the board learned that, buried within the thousands of pages of revised bylaws and policies, were provisions awarding Fernandez an additional $750,000 life insurance policy. Also buried within the binders were provisions to award Fernandez extra days pay, giving him immediate additional compensation and increasing the value of his pension.

None of the board members was able to read through all the materials in the binders, estimated to be approximately 4,000 pages. Ms. Ramos tried to read some sections with members of the teachers' union, but they did not get far. Three of the board members (Ms. Suarez, Ms Molina and Ms. Pizano) told Ms. Ramos they had not been able to read the materials, nor did they understand large portions of them. Ms. Suarez found them particularly confusing. Mr. Rojas called it an "outrageously" large amount of material to digest.

Mr. Ballas, one of the district's outside attorneys, testified he was asked to attend a special board meeting to answer questions about the proposed revisions to the bylaws and policies. The meeting was short and not particularly productive because several members either arrived late or left early for various reasons. (One member had childcare issues, and Ms. Ramos's mother had recently passed away.)

Mr. Ballas told Fernandez that his background was in municipal law and not the Education Code, and he recommended Fernandez run the revisions by attorneys at DWK. Fernandez said he would do that. Mr. Ballas also sent an email to Fernandez advising that any cost implications from adopting the revisions

should be included in the agenda analysis for the board. As it turned out, Fernandez ignored this advice.

Because of the large volume of materials to review, Ms. Ramos pulled the revisions from the agenda several times to give the board more time to consider them. She did not oppose updating the bylaws and policies, but she objected to the way they were being presented, in a rush, all at once. Ms. Ramos felt "mistrust[ful]" of Fernandez. Her concern was about being rushed into passing updates without knowing all the specific changes and how they would impact the district. She did not testify she suspected at the time that Fernandez was doing something illegal. Fernandez responded to her concerns by shifting the focus to larger issues facing the district that needed their attention, like avoiding layoffs, low student test scores and the like.

Mr. Rojas was never advised the proposed revisions gave Fernandez additional benefits. He also did not recall any discussion of any potential fiscal impact of adopting the proposed revisions. He recalled Fernandez said the changes were "pretty standard" for most districts. When Mr. Rojas asked if they had been reviewed by counsel, Fernandez said everything was "good to go." Mr. Rojas trusted Fernandez and relied on his representations in voting in favor of adopting the revisions.

Ms. Pizano testified the agenda analysis for the revisions stated the cost implications were still "to be determined." She did not recall the board ever being given that information at a later date. She also recalled Fernandez representing the revisions were standard. There was never any disclosure the proposed revisions provided additional benefits or compensation to Fernandez. Like Mr. Rojas, Ms. Pizano trusted Fernandez's

13

representation they were standard revisions and therefore voted to approve them.

Ms. Ramos testified Fernandez never disclosed or explained that any of the policy revisions, if adopted, would result in additional financial benefits to him in the form of insurance policies or extra days pay. The board, as Fernandez's supervisor, was the only entity that could approve additional compensation for Fernandez, and there should have been a specific vote on it. Ms. Ramos did not learn the revisions resulted in additional benefits to Fernandez until 2014.

The resolution to update the bylaws and policies passed with three members voting yes, Ms. Suarez voting no, and Ms. Ramos abstaining.

### f. Fernandez manipulates district lawyers and the board to conceal his conflict of interest in supplemental retirement plans.

Two different Public Agency Retirement Services (PARS) plans were presented to the board for a vote, one in 2010 and another in 2012. The 2010 PARS plan, which covered only Fernandez and assistant superintendents, was approved but was not implemented due to questions raised by the PARS agency. The second plan that eventually passed in 2012 covered a larger group of eligible long-term employees.

Ms. Evans, a lawyer with DWK, testified that Fernandez asked her to look at the 2010 plan and provide some analysis and advice regarding the way it was structured. She advised Fernandez he had a conflict of interest in managing the plan while benefitting from it, and that concern had been flagged by PARS. Ms. Evans did not advise the board about the conflict of interest.

14

Mr. Cox, assistant superintendent of human resources, worked with Fernandez, Ms. Bandoian of DWK and Ed O'Leary of PARS in drafting the plans. Mr. Cox testified Fernandez put the 2012 PARS plan on the board's agenda. Fernandez was eligible to participate in the plan, which he helped draft, and Fernandez vigorously pushed for its adoption. Fernandez proposed having an employee's highest salary year be the basis for payments under the plan, and based on his highest salary year, he would be entitled to $52,000 annually if the plan was adopted.

Fernandez spoke in favor of the plan to the board but did not disclose he would be able to participate and benefit financially if the plan was approved and implemented. Fernandez also underestimated the fiscal impact of the plan in the summary analysis presented to the board.

Ms. Ramos recalled the district considered the supplemental PARS plans as a means of encouraging long-time teachers to take early retirement which would be a financial benefit for the district. She voted in favor of the 2010 plan, believing that was its purpose. Ms. Ramos did not know Fernandez was to become the plan administrator, or that the plan would only cover senior management. She was also unaware that Fernandez stood to benefit by as much as $294,000. None of that information was presented to the board.

**g. Fernandez conceals from the board changes in law that prohibited some provisions in his 2009 contract, thereby misleading the board as to the reasons for his 2012 contract extension.**

Ms. Bandoian, a partner at DWK, testified that Fernandez asked her to look at a draft extension of his employment contract

sometime after AB 1344 went into effect on January 1, 2012. AB 1344 had a number of provisions, including prohibiting an evergreen clause and an automatic salary increase clause in certain employment agreements. An evergreen clause provides for the automatic renewal of a contract at the expiration of the term unless expressly terminated.

The DWK law firm prepared a general informational flyer about AB 1344 to let their district clients know it potentially impacted some employment contracts. Ms. Bandoian believed the flyer was probably only sent to Fernandez and not individual board members.

Fernandez's 2009 employment contract had both an evergreen clause and an automatic salary increase clause, so one or both needed to be changed if Fernandez was going to continue in his position at the end of his term in June 2012.

Ms. Bandoian prepared a memo responsive to Fernandez's inquiry to her that was intended to be copied to Ms. Pizano, who was board president at the time. Fernandez asked her to delay sending the information to Ms. Pizano until he had a chance to review it. After looking at copies of the correspondence, Ms. Bandoian acknowledged it appeared the memo ultimately sent to Ms. Pizano did not contain the AB 1344 information.

The final version of Fernandez's 2012 contract extension deleted the evergreen clause and set a new four-year term to expire in June 2016. Fernandez never told the board that changes in the law prohibited the evergreen clause in his 2009 contract.

Ms. Pizano testified she did not recall any discussion about changes in applicable law at the time Fernandez's contract extension was being considered.

Ms. Molina understood her vote was simply to extend Fernandez's term for four years. She was not aware of any other relevant issues. She had no background or legal training in employment contracts and no one provided any information to the board about new legislation impacting the contract extension or the meaning of "evergreen" clauses.

Mr. Rojas testified he did not recall any discussion about any changes in law that would have impacted the contract or his decision-making in voting on the contract. At the time, he believed Fernandez was doing a good job and voted yes.

Ms. Ramos, who ultimately abstained from the vote to approve, said there was no discussion about new legislation prohibiting evergreen clauses. Fernandez simply asserted that he thought the provision should be deleted because it was "the right thing to do."

> **h. Fernandez secretly exercises a home loan option to buy a new house without board approval.**

Fernandez's 2009 contract included a home loan provision in the event it became necessary for him to relocate and acquire a principal residence in the district. Sometime in the fall of 2012, after the board had approved the four-year contract extension for Fernandez, Ms. Evans, a partner at DWK, asked her colleague, Mr. Santana, to draft loan documents for Fernandez related to the home loan provision in his contract. After he drafted the documents, Mr. Santana sent them to Fernandez, who returned them with "redlined" revisions. Among other changes, Fernandez requested the removal of the district's authority to call the loan in the event he was terminated for cause, instead limiting the

district to calling in the loan only in the event of his "voluntary separation."

Mr. Santana sent e-mails to Mr. Hacker and Ms. Pizano, who was board president at the time, advising them of Fernandez's desire to exercise his home loan option. He included a number of recommendations for the district, including that an independent property appraisal was advisable. He also forwarded copies of the draft loan documents, but he did not forward the copies with Fernandez's redlined revisions. Mr. Santana did not receive any response from Ms. Pizano so he assumed the board did not have any questions. Mr. Santana did not make any presentations to the board about the legal or tax ramifications of the home loan for the district.

Mr. Santana told Fernandez he should have the final home loan documents presented to the board for review and approval. He did not follow up with Fernandez about whether that was done. Fernandez never presented any information about the home loan to the board for approval.

Sometime in September or October 2012, Mr. Hacker received an e-mail asking him to approve payment to DWK for a title search related to a home loan for Fernandez. In early December 2012, Fernandez called him in to his office. He told Mr. Hacker he would be signing his loan documents as the district representative. Fernandez did not say whether the board had authorized this procedure. After all the documents were signed, Mr. Hacker asked Fernandez if he wanted the transaction to be placed on the next board agenda. Fernandez said that was not necessary. Fernandez said he would write a letter to the board president advising that he had exercised his option for the loan. There is no evidence Fernandez ever wrote the letter.

18

Ms. Pizano knew Fernandez lived in or near the district and did not believe he would need to exercise the option. She recalled having a conversation with Fernandez about his home being burglarized. Fernandez said he was concerned for his family's safety and wanted to move, so he planned to exercise the home loan option in his contract. They did not discuss the issue further. The board never reviewed or voted on any loan documents. Ms. Pizano may have seen the paperwork sometime after the loan was completed or when it was pending, but not earlier and not for purposes of voting to approve it.

Mr. Rojas was aware Fernandez's contract had a home loan option but did not understand how, if or when it could be exercised. He recalled that Ms. Pizano may have said something to the effect that the loan option was "on the table" but nothing more specific. Mr. Rojas assumed that any loan contracts would have to come before the board for review and approval.

Although the loan documents were not provided to the board for review and approval, the $910,000 payment to fund Fernandez's loan was listed on a warrant report that went before the board. However, Mr. Rojas testified he never saw it. He explained that monthly warrant reports were presented to the board on the consent calendar. Payments were not individually scrutinized and voted on. Most warrant reports were voluminous. The $910,000 payment was included in a report that was 104 pages long. When reports were that lengthy, Mr. Rojas relied on Fernandez and legal counsel to highlight important matters for the board's review and consideration.

Mr. Hacker testified that in April 2014 after Fernandez was placed on leave, he reviewed various old records, including old warrant reports, and discovered the $910,000 warrant to

19

Santa Monica Escrow for Fernandez's loan was listed in the November 2012 report, a month before the loan documents were signed. The warrant was paid as a direct payment from the general fund without a purchase order being generated through the district's internal software. Without a purchase order, the warrant would not specifically be brought to the attention of the board. Mr. Hacker did not know who arranged for that to be done, but he testified it would have required a management level employee to authorize a direct payment being made in that manner.

### i. The 2014 Daily Breeze article exposes Fernandez's conflicts of interest.

In February 2014, the second Daily Breeze article came out. Mr. Rojas asked Fernandez about the article during a board briefing and said it was "disturbing." Fernandez said the article made mistakes and misrepresentations and miscounted and/or doubled his actual benefits.

Fernandez requested that Mr. Hernandez, one of the district lawyers, prepare a document summarizing the terms of his contract for the board. At a closed session meeting in March 2014, Mr. Hernandez gave a presentation to the board about Fernandez's compensation and benefits.

Ms. Molina recalled the presentation was "pretty basic" and not very detailed. She also recalled thinking it was "too late" to be receiving for the first time an explanation of the various items of Fernandez's compensation. Ms. Molina, Mr. Rojas, and Ms. Pizano each testified the benefits were more substantial than had been previously disclosed. They learned for the first time at Mr. Hernandez's March 2014 presentation about some of the benefits Fernandez had received.

Ms. Ramos testified she was not "sharp enough" to have discovered these benefits sooner. She could not recall when, but she did confront Fernandez at some point about the $1 million life insurance policy he was provided. He explained he had a heart condition, and the district was one of the listed beneficiaries, so it was a benefit for the district in the event something happened to him. She understood from their conversation the district would only be responsible for that portion of the premiums related to the district's share as one of the designated beneficiaries. Fernandez's wife was the designated beneficiary for the majority of the policy. It was not until 2014 that she learned Fernandez had actually received three life insurance policies, the $1 million policy, plus a $750,000 policy, and another $250,000 policy and that the district was paying the premiums for all three policies

**j.    The preliminary hearing ruling**

Judge Marcus found the People had adequately established all 12 counts were timely filed. The court held Fernandez to answer on all counts, except counts 6, 7 and 8, which the court dismissed for lack of proof.

**3.    The Penal Code Section 995 Motion to Dismiss**

After the preliminary hearing, the People filed an information against Fernandez alleging all 12 felony counts and the lengthy discovery allegations.

Fernandez filed a motion to dismiss pursuant to Penal Code section 995. The motion was set for hearing before Judge Ronald S. Coen. Fernandez's main argument was that the statute of limitations barred the charges. He contended the board members were aware of facts long before August 29, 2013 (more than four years before the prosecution was commenced)

21

and failed to reasonably and timely act on such knowledge. Fernandez also briefly argued a failure of proof of some of the counts.

The court denied the motion in part and granted it in part, reasoning "I do find there is sufficient evidence to uphold the information; however, that doesn't end the inquiry. There is an issue relating to the statute of limitations." The court found the board had not acted as a reasonably prudent person in discovering the alleged fraud and misconduct alleged in counts 2, 3, 4, 6, 7, 8 and 9. The court dismissed those seven counts on statute of limitations grounds only.

The People then filed this petition contending the trial court erred in ruling on the statute of limitations defense as a matter of law and requesting a writ of mandate directing the court to vacate its order and enter a new order denying the motion to dismiss.

## DISCUSSION

### 1.    Standard of Review

The petition challenges the trial court's order partially granting Fernandez's motion to dismiss pursuant to Penal Code section 995. We review the evidentiary record and findings at the preliminary hearing at which Fernandez was held to answer. When a trial court resolves a section 995 motion to dismiss, it is not functioning as a factfinder but as a reviewing court. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) It must draw every legitimate inference in favor of the information, and it may not substitute its judgment as to the credibility or weight of the evidence for that of the judge who presided over the preliminary hearing. (*Ibid.*) Likewise, an appellate court reviewing a section 995 dismissal order, by appeal or writ, reviews the determination

22

of the preliminary hearing judge.  (*Ibid.*; accord, *People v. Fine* (1997) 52 Cal.App.4th 1258, 1262-1263.)

## 2. The Discovery Rule in the Applicable Four-year Statute of Limitations

The parties agree the relevant statute of limitations as to all dismissed counts is the four-year statute at Penal Code section 801.5 which provides that "[n]otwithstanding Section 801 or any other provision of law, prosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later."  The charges of official misconduct at issue here fall within the offenses enumerated in subdivision (c) of section 803.

The discovery rule codified in Penal Code section 801.5 incorporates a diligence requirement.  " '[T]he crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of [criminal activity] thereby leading them to make inquiries which might have revealed the [criminal activity].' [Citation.]  The victim has the requisite actual notice when he has knowledge of facts sufficient to make a reasonably prudent person suspicious of criminal activity." (*People v. Lopez* (1997) 52 Cal.App.4th 233, 248, (*Lopez*); accord, *People v. Bell* (1996) 45 Cal.App.4th 1030, 1061 ["[A]n offense is discovered when either the victim or law enforcement learns of facts which, when investigated with reasonable diligence, would make the person aware a crime had occurred."].)

Where, as here, the crimes involved official misconduct with respect to government funds, the victim was the board.  The

23

board was responsible for overseeing the fiscal affairs of the district and had a legal duty to report a suspected offense to law enforcement agencies. (*Lopez*, *supra*, 52 Cal.App.4th at p. 238.) The board was also responsible for overseeing Fernandez as superintendent of the district. (See, e.g., Ed. Code, § 35161 [board "may delegate to an officer or employee of the district any of those powers or duties" but "retains ultimate responsibility over the performance of those powers or duties so delegated"].) The board's knowledge is the relevant focus for resolving the statute of limitations question.

### 3.    Analysis

At the conclusion of the preliminary hearing, Judge Marcus found the People had met their burden to show the statute of limitations did not bar any of the 12 counts. Based on our independent review of the preliminary hearing evidence summarized above, we conclude that finding was correct.

The evidentiary showing required to sustain a charge at a preliminary hearing is not substantial. (*Lujan*, *supra*, 73 Cal.App.4th at p. 1127.) All that is required is evidence supporting a " 'rational ground for assuming the possibility that an offense has been committed and that the accused is guilty of it.' " (*Ibid.*; accord, *People v. McCann* (2019) 41 Cal.App.5th 149, 154-155.) And, " '[e]very legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' " (*Lujan,* at p. 1127.) If there is some evidence supporting the finding of the preliminary hearing judge, " 'the reviewing court will not inquire into its sufficiency.' " (*McCann,* at p. 155.)

Fernandez argues the evidence conclusively established the board members were aware of facts before August 29, 2013 that would lead a reasonable person to suspect criminal activity, but

they failed to timely act on that knowledge. We disagree the statute of limitations bars counts 2, 3, 4, 6, 7, 8 and 9 as a matter of law.

### a. Counts 2 and 9

Counts 2 and 9 allege conflicts of interest in violation of Government Code section 1090 based on Fernandez's undisclosed financial interest in the 2010 and 2012 PARS supplemental plans.

After the board voted to approve the 2010 plan, it was not implemented because of the concerns raised by PARS. The 2012 plan was approved and implemented.

The board's votes on both retirement plans occurred before 2013, but there is no evidence that any member of the board knew in 2010 or 2012 that Fernandez had been involved in drafting the plans, or that he was eligible to receive significant financial benefits under the plans. Ms. Evans of DWK advised Fernandez he had a conflict of interest, but she did not relay that information separately to any board member. Fernandez encouraged the board to adopt both plans without disclosing his involvement and financial interests, and he concealed from the board, advice provided by DWK, including that his proposal to become administrator of the 2010 plan created a conflict of interest. Fernandez vigorously pushed for adoption of the 2012 plan and provided an agenda analysis to the board that underestimated the annual fiscal impact on the district of implementing the plan.

Ms. Ramos testified the presentations to the board about the plans focused on them as valuable tools for enticing older, higher salaried teachers to take early retirement as a means of reducing long-term costs for the district. She was never aware of

25

Fernandez's involvement and eligibility to receive significant benefits under either the 2010 or 2012 plan.

Ms. Ramos, Ms. Pizano, Ms. Molina and Mr. Rojas all testified they were unaware of Fernandez's conflict of interest and self-dealing with respect to the retirement plans until after the 2014 Daily Breeze article. No member of the board had actual knowledge of Fernandez's conflicts of interest before the article was published. The evidence recited at length above does not compel the inference as a matter of law that one or more board members had knowledge of facts sufficient to make a reasonably prudent person suspicious, prior to August 2013, that Fernandez engaged in criminal activity in connection with the retirement plans.

### b. Counts 3 and 4

Counts 3 and 4 allege conflicts of interest in violation of Government Code section 1090 based on Fernandez's role in advocating for the revision of the board bylaws and policies, hidden within which were highly lucrative extra-contractual benefits to him.

Like the PARS plans, the board's vote on the bylaw revisions occurred before August 2013. But the testimony of all board members demonstrated they were overwhelmed by the 4,000 pages of material and unaware that buried within those materials were provisions, drafted in part by Fernandez, that gave him substantial additional financial benefits, including a $750,000 whole life insurance policy and accrual of extra days pay not otherwise provided for in his employment contract.

Fernandez repeatedly reassured the board the proposed revisions were standard, had been reviewed by district counsel and were based on model bylaws used by districts throughout the

state. Fernandez also insisted the revisions were necessary to bring the district up to date since the existing bylaws and policies were decades old. The board relied on these misrepresentations in voting to approve the bylaws. There is no evidence any board member suspected potential criminal conduct, nor is there evidence to compel the inference as a matter of law that the board's reliance on Fernandez's misrepresentations was unreasonable. Only Ms. Ramos testified to her frustration and annoyance at having the revisions rushed through the approval process. She did not testify to having any suspicion of criminal or fraudulent misconduct.

### c.    Counts 6, 7 and 8

Counts 6, 7 and 8 allege conflicts of interest in violation of Government Code section 1090 and Penal Code section 424, subdivision (a), based on Fernandez using district lawyers for his own personal benefit in drafting his contract extension and in presenting it to the board for a vote without full disclosure of all the facts material to their decision-making, and based on Fernandez's exercise of the home loan option in his employment contract.

Mr. Rojas was unsure how the home loan option could be exercised but assumed that if Fernandez chose to exercise it at some point, the loan documents would have to be presented to the board for review and approval. Ms. Pizano also thought that was required. She believed Fernandez would have no need to exercise the option. According to Ms. Ramos, Fernandez told her he had no intention of exercising the option. The contract stated the home loan option was intended to provide a loan only if Fernandez had to relocate and acquire a principal residence in order to reside in the district. Fernandez already resided in or

27

near the district. Fernandez sought only his own personal gain when he obtained the loan to buy an expensive home a short distance from his existing home.

Fernandez used district lawyers to draft the loan documents, at district expense, rather than retain his own counsel, and he made revisions to the documents that were beneficial to him. He removed language giving the district authority to call the loan in the event he was terminated for cause, limiting the district to calling in the loan only in the event of his voluntary separation. Fernandez also disregarded counsel's advice to obtain board approval of the loan documents and directed Mr. Hacker to sign the documents as the district's designee. None of the board members saw the warrant for the $910,000 check paid to fund Fernandez's loan because it was buried within in a 104-page warrant report on the board's consent calendar and issued without a purchase order as was the normal procedure.

There is no evidence any board member suspected potential criminal conduct related to Fernandez's contract extension or his exercise of the home loan option, or to support the inference as a matter of law that the board should have discovered Fernandez's self-dealing before August 2013 despite his fraudulent concealment of his criminal acts from the board.

One may question the effectiveness of the board members, who served on a part-time basis, were largely inexperienced, and relied heavily on Fernandez to explain and educate them on the issues on which they were required to give their approval. But the evidence does not establish as a matter of law that the board knew or reasonably should have known Fernandez was scamming the district. And while Ms. Ramos had concerns before

2013 about the generous compensation and benefits provided to Fernandez that had raised public criticism from the teachers' union and the press, that does not prove as a matter of law that she knew or reasonably should have suspected Fernandez of criminal conduct.

It was therefore error for respondent superior court to have resolved the statute of limitations as a matter of law and dismissed counts 2, 3, 4, 6, 7, 8 and 9. The motion should have been denied in its entirety. (*Lopez*, *supra*, 52 Cal.App.4th at p. 251 ["If the evidence is in conflict on the question or if defendant simply fails to establish that the statute has run as a matter of law, then the motion should be denied."].)

## DISPOSITION

The petition is granted. Respondent superior court is directed to vacate its order of January 30, 2020, in case No. YA096660 granting in part and denying in part Jose A. Fernandez's motion pursuant to Penal Code section 995. The court is further directed to enter a new order denying the motion in its entirety. This opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.


GRIMES, Acting P. J.

WE CONCUR:


STRATTON, J.


WILEY, J.

29